UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-21272-ALTMAN

CCER INVESTMENTS LLC,

　　　*Plaintiff,*

*v.*

SCOTTSDALE INSURANCE
COMPANY,

　　　*Defendant.*

_____/

## ORDER

On September 9, 2020, our Plaintiff, CCER Investments LLC ("CCER"), filed a claim of loss

on one of its properties with its insurer, Scottsdale Insurance Company ("SIC"). CCER believes that

the damage to its property was caused by Hurricane Irma—which hit South Florida in 2017, nearly

three years before CCER filed its insurance claim. SIC denied the claim because the damage

(supposedly) wasn't covered by the insurance policy. It also noted that too much time had elapsed

between the date of loss and the date of CCER's claim. Unhappy with this result, CCER filed this

lawsuit, alleging that the denial was improper.

Both parties have now moved for summary judgment. SIC seeks summary judgment on two

separate grounds. *First*, it says that CCER didn't provide prompt notice of its claim, as required by the

parties' insurance policy. *Second*, it argues that CCER misrepresented the property's repair history

during discovery—thus voiding the policy. CCER, for its part, seeks summary judgment as to some

of SIC's affirmative defenses. After careful review, we **DENY** SIC's Motion for Summary Judgment

("SIC's MSJ") [ECF No. 33] and **DENY** CCER's Motion for Summary Judgment ("CCER's MSJ") [ECF No. 39].[1]

## THE FACTS[2]

SIC issued an insurance policy to CCER—"effective from September 22, 2016, to September 22, 2017"—for a property "located at 8040 SW 69th Avenue, Miami, Florida." SIC's Statement of Material Facts ("SMF") [ECF No. 34] ¶ 1; CCER's Response to SIC's SMF [ECF No. 44] ¶ 1 ("Undisputed."); *see also* SIC's SMF Ex. A [ECF No. 34-1] (the "Policy"). In the event of loss or damage to the property, the Policy required CCER to "[g]ive [SIC] prompt notice." SIC's SMF ¶ 2; *see also* CCER's Resp. to SIC's SMF ¶ 2 ("Undisputed."). In early September 2017, Hurricane Irma struck South Florida. Three years later, on September 9, 2020, CCER "reported and made a claim with [SIC]" under the Policy, attributing to Irma certain damage to the interior and exterior of the roof of its property. *See* SIC's SMF ¶¶ 4–5; CCER's Resp. to SIC's SMF ¶¶ 4–5 ("Undisputed.").

After CCER gave SIC notice of its claim, SIC "embarked on a 9 month long investigation." CCER's SMF [ECF No. 40] ¶ 2; SIC's Resp. to CCER's SMF [ECF No. 42] ¶ 2 ("Admitted."). It

---

[1] Both motions are ripe for review. CCER responded to SIC's MSJ, *see* CCER's Response [ECF No. 43], and SIC timely replied, *see* SIC's Reply [ECF No. 45]. Likewise, SIC responded to CCER's MSJ, *see* SIC's Response [ECF No. 41], and CCER timely replied, *see* CCER's Reply [ECF No. 46].

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes only and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016) (Proctor, J.); *see also Cox v. Adm'r, U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, then, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

retained Ryon Plancer, a professional engineer, to "conduct an evaluation and determine the cause of the reported loss." CCER's SMF ¶ 10; SIC's Resp. to CCER's SMF ¶ 10 ("Admitted."). Plancer inspected the property on "March 2, 2021." CCER's SMF ¶ 13; SIC's Resp. to CCER's SMF ¶ 13 ("Admitted."). Plancer ultimately found that the property's "roof leaked as a result of deterioration of roof materials, flashings and sealants that will eventually result in conditions that will permit leaks." Plancer Dep. Tr. [ECF No. 37] 35:4–6. He also determined that "[t]here was no wind damage found to the roof and interior leaks were not the result of wind caused damage." *Id.* at 35:6–7. Finally, Plancer concluded that the interior leaks were "the result of . . . progressive deterioration of the roof over time." *Id.* at 35:12–13. After Plancer's inspection, SIC denied CCER's claim because (in its view) the damage to the roof was from normal wear-and-tear, which was "excluded from coverage." Coverage Determination Letter [ECF No. 1-5] at 4–5. SIC also noted that "[t]he claim was not reported until September 9, 2020, 1095 days after the reported date of loss of September 10, 2017." *Id.* at 1. SIC explicitly "reserve[d] all rights with respect to the duty in event of loss that requires prompt notice of a claim, and with respect to the resulting prejudice to the Company from the insured not providing timely notice[.]" *Ibid.*

Dissatisfied, CCER filed this lawsuit, asserting two claims—one for breach of contract and a second for declaratory relief—both based on SIC's allegedly improper denial of Policy benefits. *See generally* Complaint [ECF No. 1-2]. It retained its own expert, professional engineer Guillermo Salinas, who concluded, "to a reasonable degree of engineering certainty, that the observed damages to the interior and exterior of the Property were caused by Hurricane Irma." Salinas Report [ECF No. 34-4] at 14. Salinas explained that "[t]he nature and extent of the observed water damage [to the interior] indicates that water entered the Property through openings in the roof created by the winds generated by Hurricane Irma, on or about September 10, 2017." *Ibid.* With respect to the exterior damage, Salinas "observed clear signs of wind-related damage to the roof on the southern (windward) side of the

Property in [ ] aerial photographs from 2018," *id.* at 15, particularly to the "roofing membrane" in the "southwest corner" of the roof, *id.* at 6. By comparing the 2018 aerial photographs to pre-Irma aerial photographs, he was able to "put one and one or two and two together": "there isn't any sort of visible damage prior to Hurricane Irma, but following Hurricane Irma, however, less than a year, approximately a year later there is some sort of damage, so that's why I'm able to correlate those two as, you know, correlate this damage . . . with Hurricane Irma." Salinas Dep. Tr. [ECF No. 36] at 72:22–73:7. Prodded by SIC's counsel, Salinas conceded that he couldn't tell whether the supposed damage he identified in the 2018 aerial photographs was "some sort of repair or some sort of damage itself," but he insisted that, even if it "[were] a repair[,] then it was in response to some sort of damage that appeared prior to [2018]" and "after the date of loss." *Id.* at 57:1–58:21.

During discovery, SIC deposed CCER's corporate representative, Arthur Hernandez. On CCER's behalf, Hernandez testified that he wasn't aware of any repairs to the roof after Irma struck in 2017 and didn't become aware of any Irma-related damage until September 2020—at which point CCER notified SIC. *See* Deposition Transcript of Arthur Hernandez [ECF No. 38] at 37:8–12, 40:12–20, 48:4–8. After Hernandez's deposition, however, CCER produced a $96,829.20 sealcoating invoice dated June 15, 2020. *See* Composite Sealcoating Invoice [ECF No. 34-3] at 1.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a

4

reasonable jury to find for the non-moving party. *Ibid.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). But the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in

favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

ANALYSIS

As we'll explain in some detail, neither party is entitled to summary judgment on any issue in the case.

### I.       CCER's MSJ Must Be Denied

CCER moves for summary judgment on three of SIC's affirmative defenses. Because two of those affirmative defenses form the basis of SIC's MSJ, we'll dispose of CCER's MSJ first.

#### a.    *SIC's Prompt-Notice Affirmative Defense*

CCER believes that SIC waived its first affirmative defense—that CCER failed to promptly report the loss—because SIC denied coverage *only* on the ground that the loss wasn't covered by the Policy. *See* CCER's MSJ at 3; *see also* CCER's Resp. to SIC's MSJ at 4 ("[B]y relying upon its engineer's uninterrupted findings and definitively asserting the loss was caused by a policy exclusion, [SIC] cannot also assert that it was prejudiced in its investigation."). CCER cites exactly one case for this proposition, *Water Restoration Guys, Inc. v. Citizens Prop. Ins. Corp.*, 347 So. 3d 449 (Fla. 3d DCA July 20, 2022). *See* CCER's MSJ at 3. In that case, Florida's Third District Court of Appeal held that, "[w]hen an insurance carrier investigates a claim of loss and denies coverage because it concludes that a covered loss has not occurred, the insurance carrier cannot assert the insured's failure to comply with the policy's conditions precedent to filing suit." *Id.* at 450.

But *Water Restoration Guys* and the cases on which it relies (which CCER doesn't bother citing) involved defenses that are markedly different from the prompt-notice defense SIC has advanced here. In *Water Restoration Guys*, the insurer prevailed at summary judgment because the insured hadn't, before

suing, submitted "certain documentation"[3] that was required by the policy. 347 So. 3d at 450. But, at the time of that lawsuit, the insurer had already determined that the claim resulted from wear-and-tear not covered by the policy. *Ibid.* On appeal, the insured argued, and the Third DCA agreed, that "[t]o require an insured . . . to provide documentation irrelevant to the purported basis for the denial, and after the denial decision is made, would be an absurd reading of the policy at issue." *Ibid.* "Accordingly, the [insured's] failure to comply with policy provisions [was] rendered superfluous by the [insurer's] denial, [and] provide[d] no basis for summary judgment[.]" *Ibid.* (reversing entry of summary judgment and remanding).

*Water Restoration Guys* stands for an intuitive proposition: When an insurer has sufficient information to deny coverage, *additional* information the insured might have been required to submit becomes "a useless and unnecessary thing"—and requiring the insured to submit that unnecessary information "would accomplish nothing." *Bryant v. GeoVera Specialty Ins. Co.*, 271 So. 3d 1013, 1021 (Fla. 4th DCA 2019). In this respect, *Water Restoration Guys* is no aberration. Florida's appellate courts have routinely reversed grants of summary judgment where the insurer was able to deny coverage, even though the insureds didn't "submit to an examination under oath [ ], file a sworn proof of loss, or submit records and documents in accordance with the 'Your Duties After Loss' section of their insurance policy." *Castro v. Homeowners Choice Prop. & Cas. Ins. Co.*, 228 So. 3d 596, 597 (Fla. 2d DCA 2017); *see also Bryant*, 271 So. 3d at 1021 (same where insured didn't submit required sworn proof of loss); *Ifergane v. Citizens Prop. Ins. Corp.*, 232 So. 3d 1063, 1064 (Fla. 3d DCA 2017) (same where insured didn't submit to required examination under oath).

---

[3] *Water Restoration Guys* doesn't explain what this documentation was. *See* 347 So. 3d at 450. But, according to the insurer's summary-judgment briefing before the trial court, the "[p]laintiff never submitted an estimate, an assignment of benefits[,] or any documentation showing . . . mitigation." Defendant's Motion for Summary Judgment, *Water Restoration Guys, Inc. v. Citizens Prop. Ins. Corp.*, No. 2018-008949-CC-05 (Fla. Miami-Dade Cnty. Ct. July 1, 2020), [State D.E. 31] at 5.

But a different rationale seems to apply to prompt-notice requirements. "[T]he purpose of policy provisions requiring prompt notice is to enable the insurer to evaluate its rights and liabilities, to afford it an opportunity to make a timely investigation, and to prevent fraud and imposition upon it." *SFR Servs., LLC v. Hartford Ins. Co. of the Midwest*, 609 F. Supp. 3d 1287, 1291 (S.D. Fla. 2022) (Ruiz, J.) (quoting *PDQ Coolidge Formad, LLC v. Landmark Am. Ins. Co.*, 566 F. App'x 845, 847 (11th Cir. 2014) (cleaned up)). "Even if an insurer believes it has other grounds for denying coverage[,] . . . it is entitled to timely notice [so it can have an] opportunity to make an early evaluation of its risks and to decide how to proceed." *Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.*, 592 F. App'x 803, 808 (11th Cir. 2014) (quoting *Nat'l Cas. Co. v. Floyd Cnty. Bd. of Comm'rs*, 2002 WL 31045373 (S.D. Ind. Aug. 29, 2002)). When notice isn't prompt, the insurer becomes *entitled* to a presumption of prejudice, which the insured must then rebut. *See 1500 Coral Towers Condo. Ass'n, Inc. v. Citizens Prop. Ins. Corp.*, 112 So. 3d 541, 544 (Fla. 3d DCA 2013) ("Failure to give timely notice creates a presumption that the insurer was prejudiced." (citing *Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1218 (Fla. 1985))).[4] And the prompt-notice presumption of prejudice isn't facially rebutted simply because the insurer is able to reach a coverage conclusion; rather, an insured must show a dispute of fact as to whether the insurer could have reached *better* conclusions (or even the same conclusions *more easily*) if it had received timely notice. *See Lehrfield v. Liberty Mut. Fire Ins. Co.*, 396 F. Supp. 3d 1178, 1184 (S.D. Fla. 2019) (Scola, J.) (first citing *PDQ*, 556 F. App'x at 849; and then citing *Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.*, 599 F. App'x 875, 881–82 (11th Cir. 2015)); *see also Yacht Club*, 599 F. App'x at 881 ("The ability to offer testimony as to causation alone does not satisfy the purpose of prompt notice

---

[4] Not every state entitles insurers to that same presumption. Construing Alabama law, for example, the Eleventh Circuit has held that an insurer "waived its right to later assert . . . [a] late notice of claim defense" "by specifically denying liability because of . . . coverage and no other grounds" because, "under Alabama law, when an insurer specifically denies liability on one ground, it waives other grounds or defenses it might later seek to assert." *First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., Inc.*, 899 F.2d 1045, 1063 (11th Cir. 1990).

and therefore cannot vitiate the prejudice suffered by [the insurer] due to delayed investigation and mitigation.").

To hold, then, that an insurer waives its prompt-notice defense when it denies the claim for any other reason is effectively to hold that an insurer "[can] *never* claim late notice as a defense"— *i.e.*, that it can *never* obtain the presumption to which it's, by law, entitled—"unless [late notice] [i]s the *sole* basis for denying coverage." *Gemini II*, 592 F. App'x at 808 (emphasis added). "Florida law does not support such a theory." *Ibid.* And the overwhelming balance of cases considering a prompt-notice defense have said so. *See, e.g.*, *ibid.* (rejecting argument that "an insurer cannot be prejudiced by late notice if it would have denied the claim even if notice had been timely"); *Yacht Club*, 599 F. App'x at 879 ("[Plaintiff] argues that an insurer cannot be prejudiced by late notice if it would have denied the claim even had notice been timely. . . . [W]e recently rejected this very argument in *Gemini II Ltd.*").[5]

---

[5] *See also Bonsignore v. QBE Specialty Ins. Co.*, 2024 WL 3103763, at *4 (S.D. Fla. May 21, 2024) (Huck, J.) ("Plaintiff asserts that because Defendant initially denied coverage based on a different policy exclusion, Defendant is barred from raising untimely notice as a defense. . . . The Court rejects Plaintiff's position and finds that Defendant has not waived its untimely notice defense." (citing *Gemini II*, 592 F. App'x at 808)); *Ro-Ma Holdings #4, LLC v. Scottsdale Ins. Co.*, 2021 WL 9748521, at *4 (S.D. Fla. Apr. 19, 2021) (Martinez, J.) ("Plaintiff argues that Defendant waived the late notice defense when it denied coverage on the merits. This argument fares no better. Contrary to Plaintiff's contentions, Defendant is not barred from raising the late notice defense merely because it denied coverage based on grounds other than late notice."); *Wheeler's Moving & Storage, Inc. v. Markel Ins. Co.*, 2012 WL 3848569, at *8 (S.D. Fla. Sept. 5, 2012) (Marra, J.) ("The Court rejects [the insured]'s argument that because [the insurer] cited the auto exclusion, in addition to late notice, as a reason for denying coverage, [the insurer] waived the defense of late notice."); *cf. 1130 W. Atl. Ave. LLC v. Scottsdale Ins. Co.*, 2021 WL 7502570, at *4 (S.D. Fla. Oct. 6, 2021) (Cannon, J.) ("Plaintiff's argument is that Scottsdale has not been prejudiced because it was still able to deny coverage on grounds other than notice. The Court disagrees[.] . . . First, the Eleventh Circuit has repeatedly rejected this argument. . . . Third, [as here], Scottsdale's coverage determination letter did not abandon Plaintiff's untimely notice as a potential ground for disclaiming coverage."). There is (it's true) some contrary dicta in a Middle District of Florida decision from 2009. *See Keenan Hopkins Schmidt and Stowell Contractors, Inc. v. Cont'l Cas. Co.*, 653 F. Supp. 2d 1255, 1262 (M.D. Fla. 2009) (Wiseman, J.) ("Florida courts have uniformly held that where an insured possesses enough information to permit it to deny the claim on other grounds (and it actually did deny the claim on other grounds), it waives its right to object to coverage on the basis that the insured failed to provide timely notice of the claim."). But *Keenan* has never been cited by any Florida federal district court for this proposition—and, in fact, when courts have cited it, they've repeatedly distinguished it. *See Bonsignore*, 2024 WL 3103763, at *4 ("Plaintiff cites to *Keenan* . . . to

Rather, "[the] differences [between substantive defenses and prompt-notice defenses] matter because requiring an insured to provide documentation irrelevant to the purported basis for the denial, and after the denial decision is made, leads to an absurd result." *Horace v. Hartford Ins. Co. of Midwest*, 2022 WL 20108578, at *5 (M.D. Fla. Aug. 19, 2022) (Conway, J.) (cleaned up). "[T]he same absurd result cannot be said to occur . . . where an insured fails to provide timely notice of their loss to their insurer[,]" *ibid.*, because raising the prompt-notice defense allows the insurer to litigate the issue of prejudice—and *whether* the insurer was prejudiced requires an inquiry that's largely divorced from the reasons the insurer gave for denying coverage. In fact, treating the prompt-notice defense like the defenses at issue in *Water Restoration Guys* would create its own "absurd result" because insurers would be encouraged to avoid investigating late-noticed claims for fear of waiving the presumption of prejudice that reasonably attaches when the insured breaches the policy.

CCER argues (unconvincingly) that *Gemini II* and *Yacht Club*, both non-binding, were superseded by *Water Restoration Guys*. *See* CCER's Reply at 2–3. Early in April 2025, though, the Eleventh Circuit affirmed a grant of summary judgment against insureds who'd breached their prompt-notice obligation, even though the insurer had denied coverage "based on a policy exclusion." *Pierce v. Nat'l Specialty Ins. Co.*, 2025 WL 985350 (11th Cir. Apr. 2, 2025); *see also Pierce v. Nat'l Specialty Ins. Co.*, 2024 WL 3224726, at *6 (M.D. Fla. June 12, 2024) (Byron, J.) ("Notably, the Eleventh Circuit has rejected arguments similar to Plaintiffs', *i.e.*, that [the insurer] waived its prompt notice defense when it denied coverage on other grounds."). Although it's also non-binding, *Pierce* is nevertheless

---

support its argument. The Court rejects Plaintiff's position and finds that Defendant has not waived its untimely notice defense."); *United Specialty Ins. Co. v. Tzadik Acquisitions, LLC*, 2019 WL 13067431, at *2 (M.D. Fla. Oct. 30, 2019) (Toomey, Mag. J.) ("Defendants cite *Keenan* . . . in support of their position. However, the Court finds the Eleventh Circuit's decision in *Gemini II*, which was decided after *Keenan Hopkins*, more persuasive."); *Wheeler's Moving & Storage*, 2012 WL 3848569, at *8 (rejecting *Keenan*). The upshot of all this is that, even if an insurer's ability to make a coverage determination bears on whether the insurer was *prejudiced* by the late notice, it doesn't bear on whether the insurer *waived* its prompt-notice defense.

persuasive in that it reached the same conclusion as *Gemini II* and *Yacht Club*—even after *Water Restoration Guys*. So too are we persuaded by a recent published decision from the Fourth DCA—based on reasoning that's consistent with the views the Eleventh Circuit articulated in *Gemini II*:

> As a preliminary matter, the [insureds] contend [the insurer] waived its untimely notice defense because it denied their claim under a policy exclusion, without raising untimely notice or prejudice in its coverage letter. We disagree.
>
> *We have previously held that a property insurer did not waive an untimely notice defense by denying coverage on other grounds.*
>
> This is true because, by denying a claim based on a policy exclusion, a property insurer asserts that the claim falls entirely outside the policy's scope. In that instance, *the insurer's conduct does not clearly demonstrate an intent to otherwise relinquish its contractual right to prompt notice of the loss*, as necessary to support an implied waiver.
>
> Phrased differently, although [the insurer] did not raise the issue of notice in its coverage letter, it timely and properly raised the defense early in the litigation. Therefore, its forbearance from initially making timely notice an issue for a reasonable time, without more, cannot constitute a waiver.

*Sec. First Ins. Co. v. Visca*, 387 So. 3d 313, 317 (Fla. 4th DCA 2024) (cleaned up & emphasis added).[6]

And the Eleventh Circuit recently held that an insurer wasn't estopped from raising a prompt-notice defense, even though it "investigated the loss and reached a decision based on the merits of the case . . . that the damage was caused by perils excluded under the policy" and "fail[ed] to mention prompt service until [the] litigation." *Gulfpoint Constr. Co. v. Westfield Ins. Co.*, 2024 WL 1759288, at *4–5

---

[6] *See also Visca*, 387 So. 3d at 317 n.2 (referring approvingly to *Horace*, 2022 WL 20108578, at *5, for the proposition that "some federal district courts applying Florida law have more clearly held that a property insurer does not waive an untimely notice defense by denying the claim on other grounds"); *Stephenson v. Fed. Ins. Co.*, 764 So. 2d 936, 937 (Fla. 4th DCA 2000) (rejecting, after rehearing, the insured's argument that "the insurers' denial of coverage constituted a waiver of the right to assert prejudice because of late notice"); *cf. Universal Prop. & Cas. Ins. Co. v. Yager*, 2025 WL 1118810, at *5 (Fla. 4th DCA Apr. 16, 2025) ("[The insurer] . . . argues that, even if the insureds had sufficiently pled their waiver claim, an insurer is not precluded from presenting its 'prompt notice' defense despite its initial acceptance of coverage and issuance of partial payment. We agree.").

(11th Cir. Apr. 24, 2024). "[T]he fact that [the insurer] passed specifically [in its coverage letter] on the question of whether the claimed damages were covered does not mean that it did not also reserve all its rights and defenses under the insurance contract[.]" *Ibid.*[7]

We'd be remiss not to note that the Third DCA—whose precedent would govern this Miami-based dispute if it had remained in state court—seems to have issued conflicting decisions on this point. In *Laster*, the Third DCA affirmed a declaratory judgment of no coverage where the insured failed to give prompt notice to the insurer. *See Laster v. U.S. Fid. & Guar. Co.*, 293 So. 2d 83 (Fla. 3d DCA 1974). The insured argued that her failure to give notice—and any resulting prejudice to the insurer—"was overcome by the testimony of [the insurer's claims adjuster], who testified that he denied the claim . . . entirely on the basis of [a] police report [that the insured was drunk]." *Id.* at 86–87.[8] In other words, the insured advanced the same argument CCER is making here—that the insurer couldn't rely on a prompt-notice defense because, whether or not the notice was prompt, the insurer had been able to determine that the claim wasn't covered by the policy. *Compare ibid.*, *with* SIC's MSJ at 3 ("SCOTTSDALE cannot continue to raise this [prompt-notice] defense due to its ability to definitively have established during their investigation the cause of loss, *i.e.*[,] the cause of loss fell within multiple policy exclusions."). Rejecting that argument, the Third DCA reasoned that the insurer was still entitled to raise prompt notice as a defense because untimely notice could have impaired the insurer's ability to "better investigate and assess its rights and liabilities." *Laster*, 293 So. 2d at 86–87. That's exactly the rationale the Eleventh Circuit recognized for treating prompt notice

---

[7] To be clear, *Gulfpoint* dealt with estoppel under Florida's "mend the hold" doctrine, under which "a litigant may not change his position on contested issues after litigation commences to prejudice his opponent's case." 2024 WL 1759288, at *4. CCER isn't making a "mend the hold" estoppel argument, but *Gulfpoint* is nevertheless instructive because it broadly rejected the proposition that a definite coverage determination nullifies the issue of prompt notice.

[8] *Laster* involved a liability insurer rather than a property insurer, but there's no indication that the *Laster* Court meant to confine its holding to the liability-insurance context. Nor are we aware of any legal difference that distinction might make.

differently. *See Gemini II*, 592 F. App'x at 806 ("The purpose of a notice provision is to allow an insurer to 'evaluate its rights and liabilities, [and] to afford it an opportunity to make a timely investigation.'" (quoting *Laster*, 293 So. 2d at 86)).

In *Wegener*, however, the Third DCA announced—in an opinion completely devoid of reasoning—that, "as a matter of law, the effect of the [insurer]'s . . . repudiation of coverage was to waive *any* right to insist upon the insureds' . . . compliance with the various conditions to recovery—*including notice*[.]" *Wegener v. Int'l Bankers Ins. Co.*, 494 So. 2d 259, 259 (Fla. 3d DCA 1986) (emphasis added). It then gestured (without pincites) to an assortment of Florida Supreme Court and Third DCA decisions—none of which in fact support the novel conclusion of law it announced. Each of the cited decisions involved substantive claim defenses (for example, the insurer's right to proof of loss or not to be liable for unilateral settlements)—*not* prompt-notice defenses.[9]

The Third DCA has cited *Wegner* just four times since 1986—each time without commentary or reasoning. In *Pasteur*, the Third DCA cited *Wegner* for the proposition that the insurer had waived

---

[9] *See Indian River State Bank v. Hartford Fire Ins. Co.*, 46 Fla. 283, 334 (1903) (holding that an insurer could waive its entitlement to proof of loss by denying coverage, but saying nothing about waiver of prompt notice of the loss); *Tillis v. Liverpool & London & Globe Ins. Co.*, 46 Fla. 268, 270–71, 279–80 (1903) (holding that, after investigating claimed loss and "express[ing] itself . . . to be perfectly satisfied . . . that [the insured] had sustained a loss," an insurer waived its right to deny payment on the basis that the insured hadn't complied with a records-keeping requirement of the policy); *Paz v. Allstate Ins. Co.*, 478 So. 2d 849, 850 (Fla. 3d DCA 1985) ("Having [denied coverage], [the insurer] cannot attempt to avoid liability by relying on a provision prohibiting the insured from settling with the tortfeasor without its consent."); *Aristonico Infante v. Preferred Risk Mut. Ins. Co.*, 364 So. 2d 874, 875 (Fla. 3d DCA 1978) ("[W]here an insurer has denied coverage which actually exists, the insurer has breached the contract and therefore cannot be allowed to rely upon a contractual provision prohibiting the insured from settlement of the claim with a responsible party in order to relieve itself from liability."); *Cunningham v. Austin Ford, Inc.*, 189 So. 2d 661, 666 (Fla. 3d DCA 1966) ("It is generally held that if an insurer without right refuses to defend, the insured is entitled to make a reasonable settlement and is not required to allow suit to be carried to judgment, even though the policy purports to avoid liability for a settlement made without insurer's consent."); *Am. Fid. Fire Ins. Co. v. Johnson*, 177 So. 2d 679, 683 (Fla. 1st DCA 1965) ("Surely [the insured] should not be penalized for failure to do the idle act of notifying [the insurer] of the settlement offer after it had renounced the contract [by denying coverage] and washed its hands of the whole affair.").

certain unspecified affirmative defenses "by failing to raise them in a timely fashion." *Pasteur Health Plan, Inc. v. Salazar*, 658 So. 2d 543, 545 (Fla. 3d DCA 1995). The court's description of the facts of the case didn't mention anything that would bear on notice. *See id.* at 543–45. In *Anatkov*, the Third DCA cited *Wegner* for the proposition that the insurer couldn't deny coverage and thereafter "rely upon a contractual provision prohibiting the insured from settlement of the claim with a responsible party in order to relieve itself from liability." *Mercury Ins. Co. of Fla. v. Anatkov*, 929 So. 2d 624, 627 (Fla. 3d DCA 2006). The Third DCA invoked *Wegner* again in *Ifergane*, where (as we explained) the insured didn't submit to a required examination under oath. *See Ifergane*, 232 So. 3d at 1064. Again, though, a defense based on the breach of a policy's examination-under-oath or unilateral-settlement provisions is a different kind of defense from prompt notice. So far as we're aware, the only time the Third DCA has applied *Wegner* literally has been in its per curiam affirmance in *Schnepel,* which upheld the trial court's denial of an insurer's motion for directed verdict on its prompt-notice defense. *See SafePoint Ins. Co. v. Schnepel*, 2024 WL 5150449, at *1 (Fla. 3d DCA Dec. 18, 2024); *see also* Defendant's Motion for Directed Verdict [State D.E. 213] at 6–7, *Schnepel v. Safepoint Ins. Co.*, No. 2019-022963-CA-01 (Fla. 11th Jud. Cir. Ct. Mar. 15, 2023).

In case it wasn't already obvious, we think the law in Florida is that an insurer isn't barred from raising a prompt-notice defense simply because it can reach a coverage decision. In diversity cases like ours, we resolve legal questions about which the Florida Supreme Court "has not spoken" by "predict[ing] how [it] would decide th[e] case." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005)). We can find "guidance for this prediction" in the decisions of the DCAs, *ibid.* (citing *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009)), and we generally defer to those decisions "absent some persuasive indication that the [Florida Supreme Court] would decide the issue otherwise," *King v. King*, 46 F.4th 1259, 1263 (11th Cir. 2022) (quoting *People's Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337,

1339 (11th Cir. 2019)). When there's an "interdistrict conflict," though, intermediate-court decisions don't "represent the law of Florida." *Royal Palm Village Residents, Inc. v. Slider*, 57 F.4th 960, 972 (11th Cir. 2023) (Newsom, J., concurring) (citing *State v. Barnum*, 921 So. 2d 513, 523 (Fla. 2005)). After all, it'd be "hard to say that 'Florida law' embodies any particular rule . . . if the applicable rule depends on the particular locale in which a case arises." *Ibid.*

Here, we think the Eleventh Circuit got it right in *Gemini II* and *Yacht Club*. Prompt notice is a unique defense—and it isn't waived simply because an insurer can determine the cause of a loss. It makes no sense to read *Water Restoration Guys* and similar cases as encompassing the prompt-notice defense, which raises issues that are distinct from causation. To the extent there's an interdistrict conflict on this issue, we've explained at length why prompt-notice defenses should be treated differently, and we're not aware of any case defending the opposite conclusion. SIC therefore hasn't waived its first affirmative defense, so we deny CCER's MSJ on this point.

### b.   SIC's "Shoddy Workmanship" Affirmative Defense

CCER next attacks SIC's fifth affirmative defense, which "alleges that the loss is barred because it was caused by faulty, inadequate or defective, design, specifications, workmanship[,] repair, construction[,] or maintenance." CCER's MSJ at 4. In CCER's view, there's no record evidence that the roof damage was caused by shoddy workmanship. *Ibid.* SIC responded by citing testimony from its expert, Plancer, who testified that he saw: "evidence of historical 'spot' repairs over time that are associated with the ongoing progression of leaks," SIC's Resp. to CCER's SMF ¶ 28 (citing Plancer Dep. Tr. 44:21–27); staining, which indicated that the roof wasn't sloped enough for optimal drainage, *ibid.* (citing Plancer Dep. Tr. at 17:16–18:11); and "inadequately bonded areas of the roofing membrane that he associated with installation deficiencies," *ibid.* (citing Plancer Dep. Tr. at 27:5–23); *see also* SIC's Resp. to CCER's MSJ at 5–6 (citing these materials). In reply, CCER argues that Plancer never

"definitively state[d]" that the damage was caused by shoddy workmanship or defective design. CCER's Reply at 5–6.

CCER's argument verges on frivolity. There's not *very much*, or *very good*, evidence of shoddy workmanship or defective design, but there is *some*—and certainly more than a "scintilla." With respect to the roofing membrane, for example, here are Plancer's exact words:

> CCER's Counsel: Were you able to confirm any water intrusion through this . . . on page 14, photograph 28? You're saying this photograph shows—
>
> Plancer: It does. It shows poorly bonded roofing membrane, so it's just showing the installed condition, that there's an inadequate bond there. And I show that same condition within my photographs. I'm not relating it to any specific interior condition though.
>
> CCER's Counsel: Does this have anything to do with water intrusion into the interior in your opinion?
>
> Plancer: In my opinion, what this shows[,] it *demonstrates inadequacies within the installation process.*

Plancer Dep. Tr. at 27:5–23 (emphasis added). If that opinion isn't in Plancer's report—which neither party bothered to enter into the record—then perhaps there might be a basis to exclude it. But there's certainly no basis to grant summary judgment on this issue. We therefore deny this second portion of CCER's MSJ.[10]

---

[10] CCER suggests, without argument or case citations, that "[SIC] never even makes mention of faulty, inadequate, or defective maintenance as a basis for its denial in its coverage decision furnished to CCER." CCER's Mot. at 5. But since it then immediately says that "[s]ummary judgment must be granted in favor of CCER on [SIC]'s [f]ifth affirmative defense, in light of the lack of evidence to support same and the affirmative evidence refuting same, proffered by Plaintiff" (in fact, CCER doesn't proffer or cite *any* evidence), *ibid.*, it waived any argument it might have made about the effect of SIC's failure to mention shoddy workmanship in the Coverage Determination Letter, *see In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

*c.    SIC's "All Policy Exclusions" Affirmative Defense*

Finally, CCER argues that SIC's ninth affirmative defense—"SIC states that it is entitled to the application of all policy exclusions, exceptions, conditions, and limitations," Answer [ECF No. 1-2] at 4[11]—"fails to satisfy the general pleading requirements applicable to affirmative defenses under Fed. R. Civ. P. 8(b)(1)(A), which requires a short and plain statement of the defense asserted," CCER's MSJ at 5. Even under the forgiving notice-pleading regime we apply to affirmative defenses,[12] this affirmative defense is deficient because it's "so broad as to encompass the entirety of the insurance contract and therefore fails to give Petitioner fair notice of the defense." *Oriole Gardens Condo. Ass'n I v. Aspen Specialty Ins. Co.*, 2012 WL 864629, at *2 (S.D. Fla. Mar. 13, 2012) (Cohn, J.). But CCER's so-called MSJ on this point is really an untimely motion to strike SIC's affirmative defenses. All CCER does is attack the sufficiency of the pleading—with no citation to anything in the record. CCER's motion to strike should have been made "within 21 days after [it was] served with the [answer]," FED. R. CIV. P. 12(f)(2)—not *443 days* later.[13] We therefore deny this portion of CCER's MSJ too.[14] *Accord Baez v. MSC Cruises, S.A.*, 2022 WL 22883192, at *5 (S.D. Fla. June 20, 2022) (Louis, Mag. J.) ("Although the instant motion is titled a motion for summary judgment, it is actually a motion to strike the defendant's affirmative defenses. . . . The time to challenge the pleading sufficiency of Defendant's affirmative defenses has long passed, and the court will not consider the motion at this juncture.");

---

[11] SIC never filed its answer as a standalone document on the docket—and instead attached it as the second exhibit to its Notice of Removal [ECF No. 1]. *See* Answer [ECF No. 1-2]. The fourth page of the Answer is the eighteenth page of the exhibit.

[12] *Bynum v. Carnival Corp.*, 2024 WL 229545, at *2 (S.D. Fla. Jan. 22, 2024) (Altman, J.) ("Rule 8 'does not obligate a defendant to set forth detailed factual allegations'; instead, 'a defendant must give the plaintiff "fair notice" of the nature of the defense and the grounds upon which it rests.'" (collecting cases)).

[13] The Answer was filed in state court on November 14, 2022, and CCER filed its MSJ on January 31, 2024.

[14] For reasons we'll explain later, *see infra* § II(b), SIC nevertheless can't present this affirmative defense at trial.

*Andreu v. Hewlett–Packard Co.*, 2016 WL 1697088, at *4 (S.D. Fla. Apr. 20, 2016) (O'Sullivan, Mag. J.) ("[A]lthough the instant motion is labeled a 'motion for partial summary judgment,' in substance it is a motion to strike affirmative defenses and should be treated as such by the Court. . . . Approximately four months have transpired between the filing of the Answer and the instant motion in this case. The Court should . . . deny the instant motion as untimely."), *report and recommendation adopted*, Order Adopting Report and Recommendation, *Andreu v. Hewlett–Packard Co.*, No. 15-cv-23270 (S.D. Fla. June 7, 2016) (Moreno, J.), ECF No. 92.

*     *     *

In short, we **DENY** CCER's MSJ in its entirety.

**II.      SIC's MSJ Must Be Denied**

CCER's failure, however, is not SIC's success. SIC moves for summary judgment on two grounds: *first*, that CCER didn't give it prompt notice (and, therefore, that the Policy is void); *second*, that CCER misrepresented material facts (and, again, that the Policy is void as a result). We find both arguments unpersuasive.

     *a.   Prompt Notice*

Under the Policy, CCER was required to "[g]ive [SIC] prompt notice of the loss or damage." SIC's SMF ¶ 2 (citing the Policy); CCER's Resp. to SIC's SMF ¶ 2 ("Undisputed."). CCER says it did; SIC says it didn't. "Insurance policy interpretation is a question of law for the Court, and absent ambiguity, the Court gives full effect to the terms of the policy through their plain meaning." *SFR Servs.*, 609 F. Supp. 3d at 1290 (citing *Canal Indem. Co. v. Margaretville of NSB, Inc.*, 562 F. App.'x 959, 961–62 (11th Cir. 2014)). "Under Florida law, notice is a condition precedent to coverage, and an insured's failure to provide timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy." *Id.* at 1291 (cleaned up). In applying a prompt-notice provision, we engage in a two-step process. First, we "determine whether the insured provided timely

notice." *Ibid.* (citing *Yacht Club*, 599 F. App'x at 879). "Second, if notice was untimely, prejudice to the insurer is presumed, but that presumption may be rebutted." *Ibid.* (citing *Yacht Club*, 599 F. App.'x at 879).

SIC's MSJ fails at the first step of this process because the question of whether CCER gave prompt notice of its claim is thoroughly disputed—and so, summary judgment must be denied.

### i.   The Prompt-Notice Standard

The Policy doesn't explain when notice is (or ceases to be) "prompt," so we'll define "prompt" by looking to Florida law. *Yacht Club*, 599 F. App'x at 879 (construing Florida law where "[t]he limitation period in the policy d[id] not define the contours of 'prompt' notice"). "[T]here is no 'bright-line' rule under Florida law setting forth a particular period of time beyond which notice cannot be considered prompt." *Ibid.* (citing *Kings Bay Condo. Ass'n, Inc. v. Citizens Prop. Ins. Corp.*, 102 So. 3d 732 (Fla. 4th DCA 2012)). Rather, "under Florida law, 'prompt,' 'as soon as practicable,' 'immediate,' or comparable phrases have been interpreted to mean that notice should be given 'with reasonable dispatch and within a reasonable time in view of all of the facts and circumstances of the particular case.'" *Ibid.* (collecting cases). Applying this standard, "Florida courts have found that notice several years after an occurrence is 'prompt' in some cases, but not others." *Ibid.* The analysis turns on exactly when the insured came to know or "reasonably should have known a loss had occurred." *SFR Servs.*, 609 F. Supp. 3d at 1291; *see also Yacht Club*, 599 F. App'x at 879 ("Notice is necessary when there has been an occurrence that should lead a reasonable and prudent man to believe that a claim for damages would arise." (quoting *Ideal Mut. Ins. Co. v. Waldrep*, 400 So. 2d 782, 785 (Fla. 3d DCA 1981))). And, because this analysis "depends as it does upon the surrounding circumstances, [it] is ordinarily for decision by the trier of facts" unless the "facts are undisputed and different inferences cannot reasonably be drawn[.]" *Ibid.* (quoting *State Farm Mut. Auto. Ins. Co. v. Ranson*, 121 So. 2d 175, 181 (Fla. 2d DCA 1960)); *see also Ramirez v. Scottsdale Ins. Co.*, 2021 WL 5050184, at *4 (S.D. Fla. Oct. 29, 2021)

(Martinez, J.) ("[W]hether notice was timely is generally a question of fact for the jury, [except] 'when the undisputed factual record establishes notice is so late that no reasonable juror could find it timely[.]'"); *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 2012 WL 1004851, at *4 (S.D. Fla. Mar. 26, 2012) (Scola, J.) ("In many cases, therefore, whether notice is timely will be a question of fact for the jury.") (collecting cases).[15]

### ii. Promptness Is Disputed

Here, a jury could reasonably draw different inferences about the promptness of CCER's notice. SIC argues that CCER knew of the damage giving rise to its claim anywhere between two years (at the earliest) and three months (at the latest) before it actually filed the claim with SIC. *See* SIC's MSJ at 5. Specifically, it asserts that CCER learned (or should have learned) of the damage when it made repairs to the roof "as early as 2018, . . . as verified by Plaintiff's engineer," and again in June 2020. *Ibid.* But SIC has overstated its case. The record before us doesn't show that CCER learned (or should have learned) of the damage in 2018. Nor does it compel us to find, as a matter of law, that CCER's three-month delay in providing notice wasn't prompt.

### A. The Record Isn't Clear that CCER Should've Known of Its Claim in 2018

With respect to whether CCER should have reported its claim in 2018, the crux of SIC's argument seems to be that CCER's expert, Salinas, somehow conceded that CCER obtained notice of damage to its roof in 2018 because it performed repairs at that time. *See* SIC's MSJ at 5 ("CCER made repairs to the roof as early as 2018 . . . as verified by Plaintiff's engineer[.]"); SIC's Reply at 3 ("Plaintiff's own expert, . . . [said] that based upon his review of historical imagery that he saw roofing

---

[15] *See also Banta Props., Inc. v. Arch Specialty Ins. Co.*, 2011 WL 5928578, at *3 (S.D. Fla. Nov. 23, 2011) (Dimitrouleas, J.) ("Normally, the issues of when a duty to give notice of a claim arises and whether the elapsed time after that duty arose makes the notice untimely are questions of fact for the factfinder."); *Allstate Fire & Cas. Ins. Co. v. Duong Thanh Ho*, 2012 WL 442980, at *6 (S.D. Fla. Feb. 10, 2012) (Altonaga, J.) ("The next question, then, is whether notice was provided within a reasonable time in view of all the facts and circumstances of the case. . . . Again, whether the notice was reasonable is a question of fact for the jury.").

repairs that he attributed to hurricane Irma as far back as 2018[.] . . . Accordingly, based upon Plaintiff's expert's own admissions the reporting of the subject loss was not prompt as a matter of law."). But that's not what Salinas said. In fact, Salinas testified that he *couldn't* tell whether certain discolorations, visible on the roof in aerial images taken in 2018, were signs of damage or repair:

> SIC's Counsel: Give me one second here. Tell me about what, in that figure 16 [of the expert's report], are we looking at where you have a circle?
>
> Salinas: So, figure 16 is an area where there was no sign of visible damage prior to the date of loss, Hurricane Irma in this case, and in subsequent photographs following the date of loss there appears to have been some sort of damage that materialized and that looks like, it looks visibly damaged on the roof itself, that particular corner.
>
> SIC's Counsel: Now[,] is that damage or is that a repair?
>
> Salinas: This image itself appears to be, it's hard to tell from the photograph, it could be some sort of repair or some sort of damage itself, but if there was a repair then it was in response to some sort of damage that appeared prior to the date that this aerial photograph was taken.
>
> SIC's Counsel: So[,] this was after the loss and you are saying it was either some type of repair or damage, correct?
>
> Salinas: Approximately a year after the date of loss, correct.
>
> [ . . . ]
>
> SIC's Counsel: And then you are also saying in the southeast corner that it's either some type of, that it looks like discoloration to you, correct?
>
> Salinas: Correct, there is a difference in the tone of that portion of the roof.
>
> SIC's Counsel: Can you rule out that it's not a repair?
>
> Salinas: From the image, no, it's hard to tell from that photograph.

Salinas Dep. Tr. at 57:15–58:18. He made this point again emphatically when SIC's counsel continued to refer to the discolorations as repairs:

> SIC's Counsel: Okay. So[,] if you are correlating a repair in 2018 with Irma, would that mean to you that the insured had noticed that there was damage as a result of Irma in 2018 versus two years later when it reported the loss to Scottsdale?
>
> [ . . . ]
>
> Salinas: I want to state that I am referring to it as a repair, *but it's hard to tell specifically from the photographs*, but the repair may have started off as something small that the homeowner probably felt he could mitigate or fix right away *but, again, I don't know if this is specifically damage or repairs* and I can't tell you what the homeowner was thinking at the time. I keep saying homeowner, the property owner.

*Id.* at 73:8–22 (emphasis added). All this testimony was consistent with Salinas's report, in which he referred to the discolorations *only* as evidence of damage and *never* mentioned repairs. *See, e.g.*, Salinas Report at 15 ("Additionally, [Salinas and his firm] observed clear signs of wind-related damage to the roof on the southern (windward) side of the Property in the aerial photographs from 2018."). Salinas's testimony therefore simply *doesn't* establish that CCER repaired its roof (and thereby had notice of the damage) in 2018.

Nor does SIC identify anything *else* in the record showing that CCER received (or should have received) notice of its claim in 2018. It suggests—without citation of any kind—that its expert, Plancer, "was advised by an employee of CCER that numerous roof repairs had been performed over the years, both before and after the passage of Irma." SIC's MSJ at 5. Plancer did testify that he "was able to interview an employee named Robert who provided [Plancer] access to the site and [Robert] informed [Plancer] that there were numerous roof repairs over the years, both before and after the passage of Irma." Plancer Dep. Tr. at 14:20–23. But CCER's corporate representative testified that "CCER [ ] ha[d] *never* employed a Robert," Hernandez Dep. Tr. at 20:10–13 (emphasis added), and that he wasn't aware of anyone named Robert who "d[id] work for [the] property," *id.* at 32:21–25, or

who otherwise worked for any tenant at the property, *id.* at 29:4–8. And, of course, even if there were an employee who could testify generally that the roof had been repaired "over the years . . . after the passage of Irma," that wouldn't show that CCER had notice of the Irma-related roof damage *in 2018*. And we couldn't draw that inference ourselves, either, because in resolving SIC's MSJ, we're bound to "review the facts and all reasonable inferences in the light most favorable to" CCER. *Pennington*, 261 F.3d at 1265.

### B.   CCER May Have Known of Its Claim in June 2020

SIC is on much better footing with its argument that CCER learned of the roof damage in June 2020—but delayed reporting its claim for three months. After all, under Florida law, comparable—or even *shorter*—delays may be deemed *not* prompt. *See, e.g., PDQ*, 566 F. App'x at 849 ("Nor do we find any error in the district court's conclusion that this six-month delay was not 'prompt.'"); *SFR Servs.*, 609 F. Supp. 3d at 1292 (five-month delay was not prompt); *Cash v. GeoVera Specialty Ins. Co.*, 2023 WL 10351939, at *5 (M.D. Fla. Feb. 27, 2023) (Bucklew, J.) (three-month delay was not prompt); *Waldrep*, 400 So. 2d at 786 (1.5-month delay was not prompt); *Deese v. Hartford Accident & Indem. Co.*, 205 So. 2d 328, 329 (Fla. 1st DCA 1967) (one-month delay was not prompt). We nevertheless think that summary judgment should be denied for two reasons. *First*, absent anything to the contrary in the Policy, we don't think that Florida law *requires* us to determine, as a matter of law, that a three-month delay is untimely—*even when* the insured unambiguously knows that its claim has accrued. In our view, a three-month delay in such circumstances isn't categorically so late that no reasonable juror could find it timely. *See Duong Thanh Ho*, 2012 WL 442980, at *6 ("Again, whether the notice was reasonable is a question of fact for the jury."). *Second*, there's *just barely* enough in the record before us to create a dispute of fact on promptness that must be resolved by a jury.

That's because it's not clear from the record whether CCER in fact learned of the roof damage in June 2020. SIC argues that, in June 2020, "approximately three months prior to reporting the loss

to Scottsdale," "CCER performed $96,829.20 worth of sealcoating [on the property], classified by the insured's own expert as roof repairs[.]" SIC's MSJ at 5; SIC's SMF ¶ 13 ("Plaintiff produced in its supplemental production an invoice for roof repairs/seal coating in the amount of $96,829.20 dated June 15, 2020." (citing Composite Sealcoating Invoice at 2)). Again turning to Salinas, SIC says that "Salinas[ ] classified the sealcoating applied to the roof of the subject property by CCER in June of 2020 as a repair." SIC's SMF ¶ 14. Essentially, SIC's argument is that, because the sealcoating was a repair—and because repairs definitionally address damage—CCER must have known about the Irma-related damage to its roof three months before it filed its claim with SIC. *See* SIC's MSJ at 5. CCER responds that "the invoice [is] for the seal coating, itself, not for a repair or application of seal coating," CCER's Resp. to SIC's SMF ¶ 13, and quibbles with SIC's description of Salinas's testimony, *id.* ¶ 14 ("Disputed[.] . . . Salinas simply testified in the affirmative that it was his belief that the coating seen in a photo was an attempt at a repair."). The invoice reflects a charge of $34,560.00 for materials, $2,269.20 for shipping, and $60,000 for "[l]abor," Composite Sealcoating Invoice at 2, but only the amounts for materials and shipping are listed as paid—on both the invoice itself and a payment receipt included in the composite exhibit, *id.* at 2–4. And Salinas was much more certain about the 2020 sealcoating than he was about the 2018 damage, never hedging on whether the sealcoating was in fact a repair—or whether CCER itself had applied the sealcoating. *See, e.g.*, Salinas Dep. Tr. at 53:20–23 ("SIC's Counsel: Do you know when the insured first noticed this damage? Salinas: I can tell you when they first attempted to repair the damages, which was in June of 2020."); *id.* at 74:23–75:4 ("SIC's Counsel: Do you know why the seal coat was applied to the roof in June of 2020 by the insured? Salinas: Not specifically why. My understanding is that at this time they may have observed damages to the interior of the property and the seal coat was, to them, an option that would be cost effective and quick to help perform the repairs necessary to this roof."); *id.* at 82:20–24 ("[B]ased on my observations there were some wind created openings on the roof that they attempted to seal

completely [with the June 2020 seal coating].”); *id.* at 88:18–21 (“[T]he property owner . . . attempted to perform some sort of repairs by applying that sealing coat.”).

The problem for SIC is that Hernandez—speaking for CCER—explicitly testified that CCER first became aware of its claim in “*September* of 2020,” when it reported the loss. Hernandez Dep. Tr. at 44:14–28 (emphasis added). He also testified that he didn’t know whether “any damage associated with Irma manifested itself prior to the claim being reported in 2020,” *id.* at 48:4–8, and that he believed the first signs of water damage on the interior of the building “appeared in probably late 2020,” *id.* at 49:16–50:7. Asked point-blank whether he was aware of any “repairs to the roof after the alleged date of loss” (when Irma struck), he testified that, “[t]o the best of [his] knowledge”— which was based on his review of the pertinent records—“[he did]n’t believe there’[d] been any repairs to the roof.” *Id.* at 37:8–12. And asked whether CCER had any records of any “coating being applied to the roof [ ] after Irma,” he testified that it didn’t. *Id.* at 40:12–20. Only *after* the deposition did CCER produce the Sealcoating Invoice; Hernandez was never presented with it.[16]

Hernandez’s testimony and the late-produced Sealcoating Invoice give rise to competing inferences about whether CCER knew (or should have known) in June 2020 about the damage giving rise to its claim. The less-charitable inference (and the one *we* find most plausible) is that Hernandez either lied at his corporate-representative deposition or came woefully unprepared, that CCER ordered and applied the sealcoating, and that it therefore *did* learn of the Irma-related roof damage in June 2020. But that’s not an inference we may draw on this summary-judgment posture—quite the opposite. The Sealcoating Invoice doesn’t say anything about *why* the sealcoating was ordered— whether it was for a repair, routine maintenance, or something else. And, because the labor costs are listed as unpaid, it also doesn’t clearly establish *whether* that sealcoating was applied or, if it was, exactly

---

[16] Hernandez’s deposition took place on October 19, 2023. The cover email transmitting the Sealcoating Invoice to SIC is dated December 9, 2023. *See* Sealcoating Invoice at 1.

*who* applied it. To be sure, *Salinas* testified (without contradiction from CCER's counsel) that CCER itself had applied the sealcoating as a repair. *See, e.g.*, Salinas Dep. Tr. at 74:23–75:4 ("SIC's Counsel: Do you know why the seal coat was applied to the roof in June of 2020 *by the insured*? Salinas: Not specifically why. My understanding is that at this time *they* may have observed damages to the interior of the property and the seal coat was, *to them*, an option that would be cost effective and quick to help perform the repairs necessary to this roof." (emphasis added)). Still, the testimony of CCER's corporate representative was that CCER *wasn't* aware of *any* repairs or applications of coating to the roof, and *Hernandez's* word, not Salinas's, is CCER's official position on knowledge and intent.[17] On top of that, Hernandez never had a chance to explain the Sealcoating Invoice, and there's no indication in the record that SIC ever sent follow-up discovery, demanded a re-deposition of Hernandez, or sought an adverse inference.

For all these reasons, there's not enough evidence in the record "blatantly contradict[ing]" Hernandez's testimony such that we can say, at this stage, that no reasonable jury would believe him. *See, e.g.*, *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). In each of the cases we mentioned, in which a delay comparable to or shorter than three months justified summary judgment for the insurer, the plaintiffs unambiguously knew of the loss but failed to report it. In *Cash*, for example, the plaintiff testified at his deposition that he directly observed the water damage from a leak in his kitchen, but "decided to report the claim . . . three months later

---

[17] Salinas's report cites three undated images of the property's roof for the proposition that *some* sealcoating (or "adhesive material") *was* applied at some point, *see* Salinas Report at 4 (citing Figures 10–12), but SIC cites no evidence that the sealcoating ordered in the Sealcoating Invoice in June 2020 was applied—and, again, Hernandez says there's no record that CCER ever performed any repairs or sealing on its roof.

because repairing the leak was too big of a job for [him]." *Cash*, 2023 WL 10351939, at *5. And, in *Yacht Club*, the plaintiff's corporate representative "clearly testified that immediately after the fact, the [plaintiff] knew that [its] structures had sustained damage from Hurricane Wilma" and "even set aside a $150,000 special assessment to address this damage." *Yacht Club*, 559 F. App'x at 880.[18]

Here, by contrast, we can't say exactly *when* CCER learned (or should have learned) of its loss. Through Hernandez, it disclaims any roof repairs and says that it reported the loss as soon as interior damage became apparent. So, this isn't a case in which the party resisting summary judgment has opportunistically manufactured its own dispute of fact. *See, e.g.*, *Santhuff v. Seitz*, 385 F. App'x 939, 944 (11th Cir. 2010) ("When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." (cleaned up)). Rather, this is a case in which there is a great deal of evidence that CCER repaired its own roof in June 2020 (and thereby learned of the damages three months before it reported them)—*but also* some contrary evidence that it didn't. Because the record "renders [CCER]'s story merely unlikely yet does not necessarily contradict it [completely], the default rule kicks in," *Brooks*, 78 F.4th at 1278, and we must deny SIC's bid for summary judgment on the promptness of CCER's notice.[19]

---

[18] *See also SFR Servs.*, 609 F. Supp. 3d at 1292 (homeowner testified that she observed her roof leaking on "at least two occasions" "at least five months" before she gave notice); *PDQ*, 566 F. App'x at 849 (plaintiff's property manager testified that, after a tropical storm, "she had received immediate complaints from the Property's tenants about roof leaks," and the plaintiff then "tarped some of the roofs at the Property right after the storm"); *1500 Coral Towers*, 112 So. 3d at 543 (plaintiff "admitted knowledge of the loss" "in discovery," but explained that it wanted to wait and see if the damages would exceed the policy deductible).

[19] As we explained, construing a prompt-notice provision is a two-step process. Since SIC's motion fails at the first step—whether notice was in fact prompt—we needn't reach the second step (the presumption of prejudice).

*b. Misrepresentation*

Leveraging Hernandez's apparent ignorance of the Sealcoating Invoice, SIC also argues that, through Hernandez, CCER made a "material false statement" by "intentionally conceal[ing] or misrepresent[ing] material facts[,] to wit[,] repairs made to the property before and after Irma." SIC's MSJ at 9–10. The Policy here provides that coverage is voided if the insureds "at any time intentionally conceal or misrepresent a material fact[.]" But there are two problems with SIC's argument: *first*, SIC waived it by not pleading it in the Answer; *second*, even if the argument weren't waived, SIC doesn't show an absence of a material dispute of fact.

## i. The Misrepresentation Argument is Waived

First, the waiver. "Under Federal Rule of Civil Procedure 8(c), defendants are required to 'affirmatively state any avoidance or affirmative defense' in their pleadings." *Keyband Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888 (11th Cir. 2014) (quoting FED. R. CIV. P. 8(c)(1)). "Failure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010); *see also Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) ("[T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial."). As relevant here, when a defendant first raises an affirmative defense at summary judgment, that defendant's "failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense." *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991) (citing *Morgan Guar. Tr. Co. of N.Y. v. Blum*, 649 F.2d 342, 345 (5th Cir. 1981)); *see also Ross v. Chisholm*, 2006 WL 8432311, at *5 (S.D. Fla. Apr. 28, 2006) (Cohn, J.) ("[A] defendant cannot raise an affirmative defense for the first time in a response to a summary judgment motion unless the response is the defendant's first pleading in the matter. Many of these defenses are therefore waived, unless [the] Defendants should later amend their pleadings."). That said, "[a] court *may* consider an affirmative defense that did not appear in the answer, *if* the plaintiff has suffered no

prejudice from the failure to raise the defense in a timely fashion." *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353 (11th Cir. 2001) (emphasis added).

In our case, SIC has obviously waived the misrepresentation affirmative defense—and, if we considered it anyway, we'd improperly prejudice CCER. SIC didn't plead misrepresentation in its Answer. *See generally* Answer. Remember, it tried to use its Ninth Affirmative Defense as a catch-all for "all policy exclusions, exceptions, conditions, and limitations," *id.* at 4—which would include misrepresentations—but, as we explained above, *supra* § I(c), the Ninth Affirmative Defense isn't properly pled. On top of that, SIC didn't move to amend its Answer to plead misrepresentation after it discovered the Sealcoating Invoice. It makes no difference to our analysis that the Sealcoating Invoice was produced after Hernandez's invoice. As we noted, SIC could have demanded another opportunity to depose Hernandez—or it could've sent, say, interrogatories to force CCER to take a position on the Sealcoating Invoice. But the record doesn't suggest that it did any of those things.

SIC argues that CCER isn't prejudiced because it learned that SIC would be advancing a misrepresentation defense at our January 10, 2025, status conference. *See* SIC's Reply at 8. But that was the day *after* discovery closed and just twenty days before summary-judgment briefs were due. *See* Amended Scheduling Order [ECF No. 23] at 1–2.[20] As we've opined in the past, allowing a defendant to raise a brand-new defense after the close of discovery is almost axiomatically prejudicial, especially when the plaintiff has no advance notice of the defense. *See Nat'l Health Fin. DM, LLC v. Sea Spine*

---

[20] There's no evidence in the summary-judgment record that SIC ever unambiguously told CCER— *before* the January 10, 2025, status conference—that it would be raising a misrepresentation defense. Even outside the summary-judgment record, the closest SIC comes is an email sent to Magistrate Judge Reid on January 4, 2024, in connection with an unrelated motion, which references the *possibility* that SIC might "seek sanctions for perceived discovery violations"—specifically, CCER's late production of the Sealcoating Invoice. *See* SIC's Response to Rule 11 Motion (Ex. B) [ECF No. 52-2] at 1–2. But that email says nothing about any misrepresentations defense.

*Orthopedic Inst., LLC*, 2022 WL 2065045, at *7 (S.D. Fla. June 8, 2022) (Altman, J.) (collecting cases).[21]
SIC obtained the Sealcoating Invoice on December 9, 2023. It had an entire month in which to amend
its Answer or to otherwise *unambiguously* put CCER on notice of this brand-new defense. And even a
small amount of time between an amendment and the close of discovery would have given CCER a
chance to develop a response. We don't mean to *overstate* the prejudice to CCER. Again, we're skeptical
that Hernandez can reconcile his sworn testimony with the Sealcoating Invoice. But make no
mistake—CCER *would* be prejudiced if SIC were permitted to advance a brand-new defense after
discovery had already closed.

### ii.  Summary Judgment on Misrepresentation Would Be Inappropriate Regardless of Waiver

Even if SIC hadn't waived its misrepresentation argument, we wouldn't grant summary
judgment on it. "[T]he question of whether an insured has made a *material* misrepresentation is a
question for the jury to determine." *Lopes v. Allstate Indem. Co.*, 873 So. 2d 344, 347 (Fla. 3d DCA 2004)
(emphasis added). As we explained above, the Sealcoating Invoice is not some unequivocal piece of
evidence, and we can't say for certain, based on the record before us, that Hernandez and CCER were
(or should have been) aware of it. On top of that, SIC doesn't explain why the misrepresentation is
*material*. Where there's, "at best, only circumstantial evidence demonstrating that" the insured has
materially misrepresented something to the insurer, misrepresentation "is a determination for a jury."
*El-Ad Residences at Miramar Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, 2010 WL 8961438, at *7 (S.D. Fla.
Sept. 28, 2010) (Jordan, J.) (denying summary judgment).

*       *       *

---

[21] Precisely *because* there's no evidence that CCER knew about the defense before the discovery deadline, the cases on which SIC relies are distinguishable. *See, e.g.*, *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007) (holding that it was an abuse of discretion to exclude an affirmative defense where "[t]he record support[ed] the view that [the plaintiff] *had notice of [the] defense* and was not prejudiced" (emphasis added)).

Accordingly, we **ORDER** and **ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment is [ECF No. 33] is **DENIED**.

2. The Plaintiff's Motion for Summary Judgment [ECF No. 39] is **DENIED**.

3. We **DIRECT** the Clerk of Court to **RE-OPEN** this case.

4. The parties must submit a proposed scheduling order within **FOURTEEN DAYS** of this Order.

**DONE AND ORDERED** in the Southern District of Florida on May 5, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record